YAZOO & MISSISSIPPI VALLEY RAILROAD COMPANY v. BENSON
B. MARTIN.

[47 South. 667; 48 South. 739.]

1. BONDS. *Railroad. Construction.*

Bonds and mortgages securing them, written in unambiguous
terms, are to be construed like other writings and their meaning
cannot be varied by precedent agreements between the parties.

2. SAME. *Income bonds. Priority.*

Railroad income bonds, issued without coupons attached, drawing
such interest, not exceeding six per centum per annum, as the
road's earnings might pay after satisfying operating expenses,
interest on "such other bonds as shall from time to time be out-
standing and such amounts as may be prescribed to be paid to
or towards sinking funds for the redemption thereof," are sub-
ordinate to all outstanding bonds of the company and not merely
to the first mortgage bonds, although a previous suit by the
holders of the income bonds seeking to have them adjudged su-
perior to all other bonds except those secured by the first mort-
gage was compromised by additionally securing the income bonds
(without changing their terms), and indorsing that fact upon
them.

FROM the chancery court of, first district, Hinds county.
HON. GARLAND G. LYELL, Chancellor.

Martin and another, appellees, were complainants in the court
below; the Yazoo & Mississippi Valley Railroad Company, and
others, appellants, were defendants there. From a decree fav-
orable to the complainants, referring the cause to a master for
an accounting, the defendants appealed to the supreme court.

The opinion of the court states the facts.

*Mayes & Longstreet, J. M. Dickinson* and *C. N. Burch,* for
appellants.

The crux of this case is not in the determination of any
equities peculiar to appellees, but in the determination of the
respective priorities, as regards the net earnings of the rail-

roads, of certain series of bonds and debentures: (1) the first mortgage bonds of 1886; (2) the income bonds of 1884 and supplemental mortgage; and (3) all other bonds and debentures.

The bonds all promise to pay to the bearer the sum of $1,000, fifty years after date; and then they say : "And further promises to pay the bearer hereof in the meantime annually, on the first day of November in each year, at its agency in the city of New York, on presentation of this bond for endorsement of such payment thereon, such interest on such principal sum (not exceeding, however, six per centum per annum) as the net earnings and income of said company from its railways in each current year ending on the first day of July next preceding the day above fixed for the payment of the annual interest hereon shall suffice to pay on all the bonds of this issue outstanding on such first day of July.

"After first paying from the earnings and income of said company from such railways (a) The expenses of operating said railways, and of keeping up and maintaining the same, with their appurtenances, (b) And of all improvements, additions, betterments, renewals and acquisitions, (c) And of providing and keeping up suitable equipment, (d) And the expenses of conducting said company's business affairs, and maintaining its corporate organization, (e) And after likewise paying from said earnings and income the interest payable from time to time upon such other bonds of said company or its successors as shall be from time to time outstanding, and such amounts as may be prescribed to be paid to or toward sinking funds for the redemption thereof. And if in any year the amount ascertained and determined to be applicable to the payment of such annual interest on the bonds of this issue shall not be sufficient for the full payment of interest at the rate of six per centum per annum thereon, the amount of such deficiency, whether partial or total, shall not be accumulative, nor be made up of any surplus income of subsequent years, but shall be absolutely waived, relinquished and discharged."

Such was the tenor of the bonds: and such is the tenor today of the bonds held by complainants, and on which they are demanding interest, not after, but before, the payment of any interest on any other bonds than the first mortgage bonds of 1884.

The supplemental bill of 1886, declared that those bonds, when stamped, conformed to the compromise and settlement of 1885, and was a fulfillment thereof, so far as the bonds are concerned. The stamp did not change the tenor of the bonds in the slightest degree. It is as follows: "We hereby further certify that this bond is further secured by a mortgage executed to us as trustees, on the 25th day of August, 1885, to which reference is hereby made for the contents and effects thereof." The endorsement so stamped declares that the bond "is further secured;" not that its terms are altered in any way. What is meant by the expression employed in such endorsement that this bond "is further secured?" Is it meant that the terms of the bond itself are so altered as that the claim of the bond as against the income and earnings is made other and different from that expressed in the bond itself, and by its own terms? Not at all. Let it be observed that these bonds are peculiar and special in their structure. The earnings and income of the railways are not pledged as security for the payment of interest. They are not pledged at all. They are not mentioned in connection with the matter of interest in any way, except by way of declaring and fixing the conditions to the payment of any interest whatever. It is the common and plain difference between the contract obligation and the security for that obligation. The promise to pay is one thing, a security for that promise is another. This bond contains a promise to pay interest on condition that the earnings and income reach a certain scale defined; but that is only the covenant to pay.

The provision, and the only provision, of the bond about security, is found in a different paragraph which is this:

"This bond is one of a series of bonds of such railway company for one thousand dollars each, numbered consecutively

from one (1) upwards, issued and to be issued at a rate not exceeding twenty thousand dollars per mile of railroad constructed ready for operation, all of which bonds are equally secured by a certain indenture of Mortgage or Deed of 'Trust, bearing date the 18th day of September, one thousand eight hundred and eighty-four, executed by the said railway company to Edward H. Pardee and Albert Crolius, as trustees, conveying upon the terms and conditions therein expressed, all such lands of said railway company situated in the Counties of De Soto, Tunica, Quitman, Coahoma, Bolivar, Washington, Issaquena, Sharkey, Warren and Tate, in the state of Mississippi, are not and shall not be required for the use of said railroad company, or its successors in the construction or operation of its or their railroads or branches."

If, now, we turn to the mortgage, which the certificate, which was bargained to be endorsed on the bonds, declares to "further secure" those bonds, we find that the mortgage does not purport to alter the promise of the bonds, but only purports to give such "further security." These further securities were as follows: 1. The rents, issues and profits of the lands; 2. The rents, issues, tolls, incomes, earnings and profits of the railways; 3. Besides which, there was a new and express limitation of the total amount of income bonds, then or thereafter to be issued under the mortgage of 1884, Exhibit C, to ten millions of dollars. So far from this mortgage being intended in anywise to alter or modify the terms and conditions of the bonds themselves in respect to the payment of interest, there is inserted in it an express proviso, in which these terms and conditions are expressly and clearly insisted on. It is as follows: "Provided always, nevertheless, and these presents are upon the express condition, that if the said party of the first part, its successors or assigns, do and shall well and truly pay the principal and interest of said income bonds when and as the same shall become due and payable, in accordance with the terms and provisions and conditions thereof, then these presents and the estates, rights and in-.

terests thereby granted or conveyed shall cease and determine, and become null and void." Thus, in and by this proviso to the mortgage it is explicitly provided that, "the principal and interest of said income bonds" were to be paid, not in any new and different way, but when and as the same shall become due and payable, in accordance with the terms, provisions and conditions thereof."

Thus, the terms, provisions and conditions of the income bonds themselves, instead of being altered or modified by this mortgage, are reaffirmed; and the fulfillment of those terms, etc., exactly as they are written, vacates the mortgage by its own express proviso. Those terms were, as we have pointed out above, amongst others, that the holders of income mortgage bonds shall receive interest only, when and after "the interest payable from time to time upon such other bonds of said company or its successors as shall be from time to time outstanding," shall have been paid.

The legal construction, and the practical operation, of the supplemental mortgage of 1885, was this: First. As to the principal of the bonds, which was not due and payable until fifty years from date, the lands, their income and profits, and also the income and earnings of the road, were pledged. Whenever those bonds shall mature, then, if not paid, the income and earnings of the railways may be resorted to as security for such principal and the legal interest accruing after such maturity. Meanwhile, the income and profits of the land are simply to be turned into the purchasing fund for the nonmatured bonds (which is a different branch of this case). Secondly. But as to the interest: by the very terms of the bonds, reaffirmed by the mortgage, there is to be no payment whatever, except (if ever) in such years, during the nonmaturity of the bonds, as the company shall so prosper as that, after payment of operating expenses, after betterments, acquisitions, purchases of equipment, interest on all other bonds outstanding, and appropriations for sinking funds—if after all of this there shall be still, in any

year, a residuum of the earnings and income, then such residuum shall be applicable to interest on the income bonds; and if not paid, then, but only then, the income and earnings of the road, not only for the current year, but also for any year, may be resorted to by seizure under the trust deed, to force such payment.

We repeat: it was never intended to enlarge the obligation of the bonds in respect to payment of interest; but only to give a better security, for the bonds and for such interest as might become payable in accordance with the terms and conditions of the bonds.

That this was the true idea, and is the true construction is evidenced throughout the supplemental mortgage of 1885. Not only does the proviso, quoted above in full, expressly insist on all "the terms, provisions and conditions" of the bonds, but also note the following:

1. There was a certificate to be indorsed on the bonds themselves. This certificate was agreed on. It was to be placed on bonds which on their face fixed the conditions under which interest was to be payable, those conditions being such as we have already seen. If any of those conditions was to be modified or abandoned, would not this certificate have so stated? Clearly so. But yet, it says not one word about interest payments, but only about security. This bond is further secured (not modified or altered, observe; but "secured") by a mortgage, executed," etc. 2. And so the mortgage itself, in its sixth paragraph, reads thus: "That the party of the first part ———— for the purpose of securing the due payment of the aforesaid bonds, in accordance with the terms now agreed upon as hereinbefore stated," etc. But not one word of any enlargement of the obligation of the bonds themselves. 3. And so in the habendum, it runs thus: "And for securing" (what?) "the due payment of such bonds, respectively," etc. Still no word about any interest beyond what is carried by the very terms of the bonds. 4. And so, in that part of the mortgage which directs the disposition to be made of the proceeds of mortgage

sales, the language of the proviso quoted above is carefully repeated. The direction is that the trustees shall apply such proceeds: "After the deductions and payments above authorized to be first made therefrom, to the payment of the principal of the said income bonds by this mortgage secured, or intended to be so, or of such of said bonds as may at that time remain outstanding and unpaid; and likewise to the payment of the interest which, according to the provisions, stipulations and conditions of said bonds, shall have accrued up to that time upon the principal of the said bonds hereby secured, and which shall remain unpaid and properly payable, with any interest accrued on such interest after default."

Thus this clear and explicit statement twice appears in the mortgage of 1885; that what interest was demandable and was secured by that supplemental mortgage, was such interest as should accrue "according to the provisions, stipulations and conditions of said bonds" themselves. There is no room left for doubt or misconstruction.

Nor can the effect of this repeated explicit statement be discounted or minified by any suggestion that such statement was improvidently made, or made by the railroad company and not fully apprehended by the other parties, etc., etc. For, in the first place, it is the clear provision of the mortgage, and it has been acted on in the commercial world as it stands, and after the lapse of twenty-three years of circulation of the various issues of bonds to many millions of amounts, it must be taken and enforced as it reads. In the second place, it was not a statement shrewdly or cunningly inserted by the railroad company, to the entrapping of Martin and his associates. This mortgage of 1885 was the outcome of litigation begun by Martin and his associates in 1883 for the assertion of their rights in the premises. One of the complainants in the litigation was N. H. Harris, and the solicitor was Alf. B. Pittman. These men were members of the bar of this court; and this court well know their full and unquestionable ability. They were two of the best

lawyers in Mississippi; and it will be idle to talk about their not knowing what they were doing. Now after the amended bill was filed in that cause (February 17, 1885), the parties came to an agreement of compromise, in the month of July, 1885, by which all controversies were settled "in respect of the form of the bonds, and the provisions of the mortgage." This is the express statement of the supplemental bill filed in that cause on June 5, 1886, by which the final delivery of these very bonds was demanded and obtained. The execution of the mortgage of 1885 was therefore a compromise; and a compromise necessarily imports a mutual concession. Let it be noted also that three of the complainants in this supplemental bill, were Thos. C. Catchings, R. S. Buck, and H. C. McCabe— three more of the best lawyers in the state. Nor was this compromise mortgage of the one-sided devising of the railroad company. Its terms were agreed on in advance; and the agreement appears in the printed record.

When, therefore, this mortgage twice declares, in the most unequivocal terms, that the interest secured by the mortgage was such interest as should become due in accordance with the provisions, stipulations and conditions of the bonds, it must be taken that the mortgage means what it says; and also that the very able attorneys who, as owners and representatives of Martin and other interested parties agreed to it in advance and stipulated for it as written—that they also meant what it says. If not, then where is any finality to anything?

One of the most striking of the terms and provisions of the bonds (the whole terms, provisions and conditions of which were thus plainly reaffirmed by the mortgage of 1885) was that which declares that the earnings and income which should be attributable to the payment of interest, was what should be left, if any, after first paying various enumerated things, one of which was "the interest payable from time to time upon such other bonds of said company or its successors, as shall be from time to time outstanding." This clearly carried the power to

issue other, further and subsequent series of bonds, whose interest claims should be nevertheless prior in right. But the gravamen of the present bill, and the purport of the decree appealed from, are directly in conflict with this provision of the bond. It is claimed by the appellees that this provision applied and could only apply to the interest payable on the first mortgage bonds of 1884. But clearly this is not correct.

This language of the bonds was fixed by the income bond mortgage of September 18, 1884; and the first mortgage was of the same date. Those two mortgages were contemporaneous. The first mortgage bonds were therefore of identical issues as to date and time with the income bonds—and to restrict the meaning of that phrase of the latter bonds now under discussion (*i. e.,* "upon such other bonds of said company, or its successors, as shall from time to time be outstanding") to the first mortgage bonds of 1884, is to make that phrase meaningless. For, those bonds were then and there, on that same day, issued, or provided for, by that same company. How could it be that those bonds could be issued by any successor to that company, when they were then and there issued by that company itself? The expression "or its successors" used in that connection, shows clearly that other and subsequent series, issued from time to time indefinitely, were provided for.

Important although this case is, we conceive that it will serve no useful purpose to go through the various complaints of this bill, item by item, in connection with this aspect of the controversy. The question is essentially the same, whether it arises in connection with the second mortgage of 1886, or the Yazoo & Mississippi Valley Construction Mortgage for $2,800,000, or the construction and equipment debentures of various series and dates. They are each and all provided for, as to their priority of interest charge, by those terms of complainants' bonds. Neither is it necessary to take up the assignment of errors, and discuss its items *seriatim.* The foregoing discussion is germane to all of those items from one to ten, inclusive.

· · The contention of the bill is that appellees are entitled to have their bonds now paid, either in whole or in part, out of the net proceeds of the land sales. The answer admits that such net proceeds amount to $2,363,492.49. But we deny that appellees are entitled to have their bonds now paid, either in whole or in part, out of such net proceeds, except in accordance with the terms of the mortgage of 1885. Their bonds are not due, and will not be until 1934. If they are to have any payment before maturity, such payment must be made in accordance with the contract, and not outside of it. The provision of the mortgage is as follows: "The net proceeds of such sales or disposition thereof, after payment of such amounts, shall be applied to the discharge of the said income bonds issued and secured hereunder in the following manner, viz: Whenever, and as often as, the trustees shall accumulate in their hands as much as $25,000, which the railroad company shall not require for any of the purposes mentioned in either of the two paragraphs immediately preceding, and shall, through its officers, declare to be applicable to said income bonds, the said trustees shall advertise for sealed offers thereof in some daily paper, published in the city of New York, and in one published in the city of Vicksburg, Mississippi, and in such others as may be deemed expedient, for thirty days, specifying the amount of money, subject to investment in said bonds, inviting offers, and stating the time and place of the opening of the proposals. At the appointed time such proposals only shall be received or opened as shall be accompanied by, and have filed with them, before the opening of any of the bids, the bonds offered in the sealed bid, and the bid, when opened, shall be deemed and treated as offering such bonds only as were so filed therewith before the opening of the bids, etc.

Thus, by the express provisions of the only contract which forms any basis for a claim that the bonds may or shall be discharged before their maturity, it is stipulated and agreed by the bondholders that such discharge is to be in one certain way;

and by that one way only; which is, that after certain preliminaries shall have been had, there shall be a competitive bidding for the money applicable, by the bondholders; and to him who shall offer his bonds at the lowest price the money shall be awarded.

Now, the bill in this case does not seek a performance of that contract. It does state that such bidding has not been had as directed by the mortgage; but while so stating, and while charging sinister and unjust plans and schemes against the railroad company in that connection, it still does not pray that the contract be performed, but prays for a departure from it. The bill does not ask for a competitive bidding, but prays for a *pro rata* distribution without any bidding. The bill does not pretend that complainants or any one else ever desired or called for such a bidding, or in any way requested of any one that it be had.

It will be observed that by the express provision of the mortgage, which even this bill does not challenge, the liability for interest on these bonds is a liability as for interest to be actually earned during each current year. It is not a general liability as in the ordinary case of interest running on a contract for borrowed money. The interest must be earned year by year; the bill alleges that such interest was in fact earned, and should have been paid, although it was not paid. So, then, the question of each year's interest is a fact to be determined by an investigation year after year of each year's business, and the striking of balance as and for each year. Each year stands to itself as a separate and distinct matter of investigation. The liability, therefore, for interest, if it exists at all, fell in at the expiration of each fiscal year, being the first day of July. And if, as to each year, the complainants waited for more than six years before filing this bill for an accounting, they are barred.

*Catchings & Catchings, Alexander & Alexander,* and *T. M. Miller,* for appellees.

The contention of appellants, that the language of the bond

is an express grant of power to the railroad company to issue as many bonds or as many series of bonds as it may see proper, whenever and as often as it pleases, is erroneous. The income bonds were issued with, and as a part of the written contracts between the parties, and not for the purpose of abrogating the contracts. They were accepted, not in lieu of the bonds called for by the contracts, or in substitution for the bonds therein provided, but as being a fulfillment of the contract issued in accordance with it and in performance thereof. It must be remembered that no innocent third person's rights have intervened as to these bonds. The Illinois Central Railroad Company, through its subsidiary corporations, bought these bonds *pendente lite*. All the contracts providing for their issuance were filed as exhibits to the suit. The suit, far from being dismissed or abandoned, was, at the time of its purchase, being prosecuted with all possible vigor. The purchase by the Illinois Central Railroad Company was on June 18, 1892; the consolidation into the Yazoo & Mississippi Valley occurred October 24, 1892; and only a few weeks later leave was given to file an amended bill and orders made requiring the defendants to answer. The rights of no innocent third persons are involved. The contention is that the provision that the amount of interest payable on the bonds is ascertainable after deducting, among other things, "the interest payable from time to time upon such other bonds of said company or its successors as shall be from time to time outstanding" is in fact a contract permitting unlimited bond issues secured upon the income of the railways. It must be remembered that the road had not been built when the bonds were issued. The first mortgage bonds according to the contract, both the contracts for their issuance and the contract contained in the first mortgage itself, were not all issued and placed on the market at once. The very amount to be issued was uncertain, and depended on the mileage and cost of the railroad. They were to be issued at a certain rate per mile from time to time as the road was built. When the income bonds were prepared, no

other bonds, except the first mortgage bonds of 1884, were in contemplation, no contingency was contemplated, or provided for under which additional bonds might be issued. It was therefore impossible in defining and limiting the promise to pay, contained in the income bonds, to specify definitely the amount of interest charged on the income which should be prior and paramount; therefore, it provided that the interest should be subordinated to the interest on such other bonds (meaning first mortgage bonds), as should be from time to time outstanding; that is, such as should have been issued from time to time under the contract providing for their issuance. The prior interest charge should not be the interest on the entire $20,500,000 of first mortgage bonds, but such of them as might lawfully have been issued and be outstanding from time to time.

No construction of language should be adopted which would make the bonds wholly valueless. A reasonable construction must be given. It would be unreasonable to hold that Martin and his associates owning these railroad corporations with their valuable franchises, assets, bounties, including the immense tracts of land, would turn them over and accept in payment a bond with the promise to pay only such sums as the company might elect to pay. It is perfectly obvious as a business proposition that no mortgage or pledge is worth anything as a security if it is expressly subordinated to any other pledges or mortgages which the debtor wishes to make at any time in the future. The court will not lightly adopt any construction of a contract that will treat it as such an absurdity from a business standpoint. The real inquiry is what bonds were meant by the words "such other bonds" as shall be "from time to time outstanding." Is this a contract that there shall be outstanding bonds charging the income? Surely that will not be contended. Is it then an express permission to pledge the income at any time unlimited in amount and unrestricted as to terms? It will be noticed that neither the income bonds nor the mortgage to secure them refer in any way expressly to the first mortgage, except where

the latter conveys the rents, issues, tolls, income, earnings and profits of its railways or railway lines "subject to the lien of the first mortgage of the party of the first part dated September 18, 1884." Therefore we cannot find on the face of the bonds the real contract as to the *amount* of the bonds which are to be a prior charge, but must look outside of it to the agreements, including the agreement contained in the first mortgage and the income mortgage, to find any stipulation on the subject. There is no inconsistency between the clause in the bonds providing for deduction of interest in other bonds outstanding from time to time and a contract *dehors* the bonds limiting the *amount* of such other bonds. The words "other bonds" do not mean other than the first mortgage bonds of 1884, but other than the income bonds containing the clause.

Here the bonds by express provision, stamped on them, refer to the mortgage. When we refer to it we find that language could not be used to more plainly express the intent that the whole net income is pledged for these bonds, except only that needed to pay interest on the first mortgage bonds. But appellants argue that while the income including rents (less that to pay the first mortgage bonds) is pledged by the income mortgage, this is only to secure the *principal* of the bonds, when due. Our answer to this is that this view would make the bond conflict with the mortgage. If the bonds be held to permit the income in excess of interest on the first mortgage to be applied to any unlimited amount of subsequent bonds, then how could the contemporaneous mortgage pledge such excess inviolably for even the principal of these income bonds. The argument, if we apprehend it, seems to be that the mortgage pledges such excess income, but the bond does not promise to pay it but devotes it in direct conflict with the pledge to any other bonds at the will of the company. No such construction can be tolerated. The bond must be harmonized with the mortgage securing it, and this can be done only by holding that the *amount* of other outstanding bonds conveying the income must

be held to be fixed by the agreements and by the terms of the first and the income mortgage and that the bonds so fixed are those referred to as "other outstanding bonds," and the words "outstanding from *time* to *time,*" recognize that the first mortgage bonds were to be delivered in future from time to time, and the amount outstanding at any particular time could not be definitely stated.

But the view advanced by appellants will not aid them if sustained. They, of course, do not deny that the income mortgage pledges the excess income over the interest on the first mortgage bonds, to the *principal* of the bonds. Then such excess cannot be otherwise applied. Even if not to be currently paid each year on the income bonds, such excess is an inviolable fund and cannot be paid out on subsequent bonds, but is a trust fund to be preserved and invested to meet the principal when due. The payment of it to other bonds would be enjoined. But the construction contended for does violence to the contracts, to the terms of both mortgages, to the intent of the parties as shown in the pleadings in the former suit, and presents an unbusinesslike and unworkable scheme. If such excess was not intended to be paid over each year then there would have been a provision for a sinking fund in the income mortgage, or some other provision for preserving the income so pledged. Money which is not to be paid, but to be kept undisposed of in any way, is hardly the subject of a pledge. We cannot suppose that practical business men and experienced financiers, intending to build a line of railways of indefinite length, would bind the railway company for a period of fifty years to accumulate all the income (in excess of $1,025,000) when such accumulated income would amount to far more than the debt to be then paid, and with no provision for safe-guarding or investing the fund during that long period. The corrected income mortgage of 1885 absolutely and unconditionally conveys all the *income, earnings, tolls* and *profits* without any allowance or exception for betterments, additions, extensions, etc. Suppose we should adopt appellants' ar-

gument and contend that this grant in the mortgage cannot be limited or modified by the bond, that it stands by itself and therefore none of the income may be spent for betterments and would not the distinguished counsel for appellants meet us with the sufficiently obvious reply that the mortgage must be con-- strued with the bond and that the bond shows what is the meaning of the words "earnings and profits." If in ascertaining the true meaning of these words we should look to the bonds can we not in ascertaining what "other bonds" outstanding mean or the amount thereof allowable, look to the contemporaneous mortgages and contracts?

To summarize on this branch of the case, we say: The bond itself expressly promises to pay to the holders annually the net income (over the amount needed to pay the interest on the first mortgage bonds) and the words "other bonds" outstanding, mean other bonds of the issue of 1884. If we are mistaken in this, the corrected mortgage of 1885 unequivocally conveys such income to pay the interest on the income bonds. If mistaken in both of these views, the income mortgage of 1885 certainly conveys all such excess income to pay the *principal* of the income bonds and any past or future appropriation of such income to subsequent issues of bonds or script is and will be a clear violation of the contract rights of the income bondholders and will be enjoined.

The disposition of the proceeds of the lands has from the first been in flagrant disregard of the rights of these complainants. From the very outset the distinct understanding was that the lands should be a special security solely for the income bonds. These lands, together with a few miles of completed railroad, composed the valuable physical properties owned by Martin and his associates. They had a value independent of the franchise of the railroad, and we find that the first completed agreement provided that the income bonds should be secured by a first mortgage on all the lands, but with a very necessary proviso that the lands might be sold upon the condition "that the

proceeds of such sales or dispositions thereof shall be applied to the discharge of such income bonds or shall be held in trust by or under the directions of the trustee of such mortgage, as security for the outstanding income bonds secured thereby." It will be noted that this does not stipulate that the proceeds shall be applied only to the principal of the bonds, but as there was an enormous acreage of these lands, and they were prospectively very valuable it was supposed that the proceeds thereof would go very far towards paying these income bonds, and it was further contemplated that accrued interest was to be paid.

So jealous were Martin and his associates of their right to have the proceeds of these lands appropriated, as they were sold, to pay the income bonds that the mortgage provided for a system of bidding for the purpose of retiring the bonds as often as the sum of $25,000 should accummulate in their hands. There was no discretion given to the trustees in regard to thus retiring the bonds. It was, however, made a prerequisite that the officers of the Louisiana, New Orleans & Texas Railroad Company should declare the amount accummulated to be applicable to the income bonds. Upon such declaration being made, the trustees were required to advertise for offers to retire the bonds. It is obvious from the contracts, the face of the mortgage, and the admitted facts that this enormous fund, between two and three millions of dollars, cannot either legally or equitably be withheld from the bondholders.

It is to be noted that the Yazoo & Mississippi Valley Railroad Company is not a "successor" of the Louisville, New Orleans & Texas Railroad Company, within the meaning of that word as used in the bonds. By no just reasoning can it be said that when the bonds were issued anything more could have been looked for or contemplated than the issuance of such further bonds by the Louisville, New Orleans & Texas Railroad Company as might be necessary to make the railroad enterprise undertaken by it effective. It could not have been contemplated that this railroad company would become consolidated with another company

engaged in a different railroad enterprsie, and that this consolidated company should have the right to issue bonds to make 'effective this additional railroad enterprise, which should be prior to the right of the holders of the income bonds in question to receive interest.

CAMPBELL,* Special Judge, delivered the opinion of the court.

In the year 1882 E. Martin, with associates, was a promoter of the important enterprise to construct a railroad from Memphis, Tenn., to New Orleans, La., through the state of Mississippi, and had obtained control of several charters which had been granted by the states named looking to the construction of a railway over the route, as well as of sundry assets of companies which had been organized under those charters. In that year he made a contract with one Johnston to construct the road and transferred to him all his rights under the several charters mentioned with the assets of the several companies including seven hundred and thirty-four thousand acres of land in the Mississippi Delta for $394,000 paid and other benefits promised as set forth in a written agreement between the parties. Other parties were interested with Johnston. The plan contemplated for the construction of the railroad was to form a new company by consolidation of different existing ones. The parties engaged in the enterprise proceeded to the execution of the plan by agreeing upon consolidation of several companies and the name of the new company and preparing two classes of bonds for it, one being first mortgage bonds with interest coupons and secured by a first mortgage on the railway, its income and earnings to the length of eight hundred miles, the bonds to mature in fifty years, the interest at five per cent. payable semi-annually. The others were called income bonds payable at the expiration of

---

* WHITFIELD, C. J., being related to one of the parties, recused himself in this case and J. A. P. Campbell, Esq., a member of the supreme court bar was appointed and presided on the trial of this cause in his place.

fifty years, without coupons, each for $1,000, with such interest on such principal sum (not exceeding, however, six per centum per annum), as the net earnings and income of said railway company from its railways in each current year ending on the 1st day of July next preceding the day above fixed for the payment of the annual interest hereon shall suffice to pay upon all the bonds of this issue outstanding on such 1st day of July, after first paying from the earnings and income of said company from such railways the expenses of operating said railways, and of keeping up and maintaining the same, with their appurtenances, and of all improvements, additions, betterments, renewals, and acquisitions, and of providing and keeping up suitable equipment, and the expenses of conducting said company's business and affairs, and maintaining its corporate organization, and after likewise paying from said earnings and income the interest payable from time to time upon such other bonds of said company or its successors as shall be from time to time outstanding, and such amounts as may be prescribed to be paid to or towards sinking funds for the redemption thereof. And, if, in any year, the amount as ascertained and determined to be applicable to the payment of such annual interest on the bonds of this issue shall not be sufficient for the full payment of interest at the rate of six per centum per annum, the amount of such deficiency, whether partial or total, shall not be accumulative, or be made up out of any surplus income of subsequent years, but shall be absolutely waived, relinquished, and discharged. The mortgage or deed of trust which secured the income bonds conveyed to trustees all the lands in the Mississippi Delta which had been conveyed by Martin not required in the construction or operation of the railroad or branches, but conveyed nothing else for the security of the bonds.

At this stage of the proceeding, on September 15, 1883, Martin and others exhibited a bill in the chancery court of Warren county complaining of violation of contract, and prayed and obtained an injunction against carrying out the plan of consolida-

tion described above.   The case was removed to the United
States court at Jackson, Miss.   On the 17th of February, 1885,
an amended bill was exhibited by the complainants charging
that in disregard of the injunction the defendants had consoli-
dated into the Louisville, New Orleans & Texas Railroad Com-
pany, and on the 18th of September, 1884, had executed and de-
livered to different parties many millions of dollars of bonds to
be followed by others and certificates of stock, and had executed
a mortgage to secure the bonds, and also a deed of trust for in-
come bonds and delivered a large amount of these to certain
persons, all in violation of the agreement between the parties
of 6th of August, 1884.   Many violations of the agreement were
set forth in the bill, and the language of the income bonds was
set forth as copied above.   It was averred by the amendment
that the complainants were entitled to bonds with interest not
exceeding six per cent. per annum out of the income of the com-
pany not limited to the income of its railway, and especially
were they entitled to the income from rents, issues, and profits
of the lands of the company, and that they were entitled to
bonds, the interest and principal of which should be secured
by mortgage next to the first mortgage, and yet, by the terms of
the income bonds, the net income pledged for the payment of
the interest may be devoted first to the payment of interest of
such other bonds of said company or its successors as shall from
time to time be outstanding; and, further, that "it should have
been limited to payment of interest of the first mortgage bonds
as the only bonds secured by a mortgage paramount to the in-
come bonds," and a further objection urged was that there
should not be a provision for a sinking fund for the payment of
the principal of the first mortgage bonds.   Violation of the in-
junction was charged, and defendants were cited to appear at
the May term, 1885, of the court to answer for contempt.   By
agreement the time for defendant to answer the amendment and
the charge of contempt was extended to the first Monday of Sep-
tember, 1885, and it was further agreed that a new mortgage

or deed of trust for the security of the income bonds should ·be· executed by the Louisville, New Orleans & Texas Railroad Company, the form of which was given, and it was stipulated that the income bonds already in existence (should not be changed) should each be stamped with words: "We hereby further certify that this bond is further secured by a mortgage executed to us as trustees on the ——— day of August, 1885, to which reference is hereby made for the contents and effect thereof." New bonds were not to be executed. They were to remain as they had been drawn. The new provisions to be put in the new mortgage or deed of trust for the security of the income bonds were (additional to the Delta lands which were conveyed by the first mortgage to secure income bonds): "The rents, issues and profits of the land, and, subject to the lien of the first mortgage of the company of September 18,. 1884, all the rents, issues, tolls, income, earnings and profits of its railways or railway lines which the said party of the first part now possesses or is entitled to or may become possessed of or entitled to." And the trustees were to give bond with security in the sum of $50,000 conditioned for faithful performance of duty. And the mortgage was to contain the following provision for the application of the net proceeds of the sale of the lands conveyed by it, viz.:

"Third. The net proceeds of such sales or disposition thereof, after payment of such amount, shall be applied to the discharge of the said income bonds issued and secured hereunder in the following manner, viz.: Whenever, and as often as the trustees shall accumulate in their hands as much as $25,000, which the railroad company shall not require for any of the purposes mentioned in either of the two paragraphs immediately preceding, and shall, through its officers, declare to be applicable to the income bonds, the trustees shall advertise for sealed offers thereof in some daily paper, published in the city of New York, and in one published in the city of Vicksburg, Mississippi, and in others as may be deemed expedient, for thirty days, specify-

ing the amount of money subject to investment in said bonds, inviting offers, and stating the time and place of the opening of the proposals. At the appointed time, such proposals only shall be received or opened as shall be accompanied by, and have filed with them before the opening of any of the bids, the bonds offered in the sealed bid, and the bids, when opened, shall be deemed and treated as offering such bonds only as were so filed therewith before the opening of the bids. All such sealed offers as are received and accepted as such shall be registered before the opening of any bids, and none of them or the bonds therewith shall be thereafter withdrawn from the competition. The opening of the bids shall be done by the trustees in the presence of all bidders or their representatives, who may be present, who shall have the right to inspect the same. The bids shall be registered as they are opened and a record of the bidder made. The serial number of bonds offered and the prices for which they are offered shall be made and kept, subject to the inspection of income bondholders. In case two or more of the lowest offers are at the same rate, their bonds shall be taken in stock due to E. Martin and associates, other than Harris and equal numbers, etc. And it is hereby further provided, declared, granted, and agreed that in case default shall be made in the payment of the principal of said bonds hereby secured, or of any such bonds, when such principal shall be due and payable, then and in that event the said parties of the second part, or their successors in the trust, shall be entitled to, and may, upon the requisition in writing to that effect of holders of a majority of such income bonds hereby secured, and upon being duly and properly indemnified by such bondholders against expense or loss in the premises shall either personally or by agent or attorney, enter into and upon such part of the said mortgaged premises as shall then remain subject to the lien and operation of this indenture or mortgage, shall have, hold, and possess the same, with the rights and privileges thereunto appertaining."

The record shows that the new and supplemental mortgage or deed of trust, as agreed on, was duly executed, and the income bonds were duly stamped as agreed, and that the bonds and stock due to E. Martin and associates, other than Harris and Klein (which were in litigation), had been properly executed and delivered to the parties entitled. They are not parties to this suit. The bonds and stock due to Harris were involved in litigation which delayed their delivery until a recent date when they were delivered in pursuance of a decree of the federal court mentioned above which ordered their delivery by parties other than the appellants in this case.

This suit was brought by B. B. Martin and B. W. Griffith, assignees of the bonds and stock due to Harris, being bonds to amount of $95,500 and stock to amount of $47,900. The claim of complainants is that the income bonds held by them have been improperly subordinated to bonds of the obligor other than their first mortgage bonds, and that the proceeds of the sale of the lands mortgaged to secure the income bonds have not been properly dealt with, but have been diverted from their proper application. Wherefore they seek relief prayed in their bill. As stated by counsel for the appellees, "the principal controversy is as to the right to the net income of the railway as between the different series of bonds." The other question is as to the proceeds of the sale of the seven hundred thirty-four thousand acres of land, all of which have been sold except a few hundred acres, and the net proceeds of which are admitted to be several millions of dollars, and also admitted by the appellants to be appropriable to the income bonds in accordance with the terms of the mortgage securing them. We will now consider these matters.

It seems to us very clear that the income bonds by their express terms are subordinate to all such bonds of the railway company as were issued from time to time and be outstanding. This is the plain stipulation of the income bonds as understood and agreed on in the final settlement between the parties when

all their differences and controversies were ended in 1885; for, as stated above, one of the objections urged by the amended bill of the complainants in the federal court on the 17th of February, 1885, was that the income bonds as drawn were by their terms made subordinate to all outstanding bonds of the company, whereas, it was averred, they should come next to the first mortgage bonds. That was undoubtedly a correct interpretation of the bonds, was well understood and urged as a just objection to them, an yet, while the new and supplemental mortgage or deed of trust for the security of these very bonds was made to contain new and important provisions for their security, the bonds remained unchanged in a single particular, remained and were accepted in the very words they contained at first, but were stamped on the back with the words: "We hereby certify that this bond is further secured by a mortgage executed," etc., as shown above, and the supplemental mortgage by which they were further secured did not change a single word of the bonds in the terms or effect. No provision of the supplemental mortgage for their security varies in the slightest particular the words of the income bonds. It is neither necessary nor proper to look to precedent agreements of parties to ascertain the meaning of the bonds, and the instrument to secure them. There is nothing ambiguous, doubtful, or uncertain as to their meaning. It is as plain and clear as language can make it. All precedent contracts were merged in the final settlement which terminated all controversies, and fixed the rights of parties. Nor does it seem marvelous to us that such a settlement should have been made at the time. The railroad had not been built and equipped then. The outcome of the great enterprise could not be foreseen. It was known that the cost would be great and issuance of bonds for construction and equipment was expected. Hence recognition in the income bonds of the right to issue bonds other than the first mortgage bonds to all which the interest of the income bonds should be subordinate. Besides, the lands were looked to and relied on for the retirement

of the income bonds and probably were expected to be sufficient for that.    Be this as it may, there is no escape from the plain provisions of the bonds and mortgage which stand as the sole exposition of the right of parties.    It is only the interest on these bonds which was by their terms contingent and problematical.    The principal is absolutely unconditional.    A manifest distinction is made throughout the bonds and deed of trust between the principal and the interest of the bonds.    It was only on default as to principal that the trustees were empowered to proceed under the deed of trust, and it is obvious that the interest was risked on the success of the enterprise known to be full of hazard.    The net proceeds of the lands conveyed are appropriable according to the provision of the mortgage or deed of trust conveying them—*i. e.,* holders are entitled to competitive bidding as provided for—and we do not see any difficulty in the way of carrying on the scheme provided by the instrument securing them.    If it shall be made to appear that the contingency on which the accrual of interest was made to depend has happened, the interest is recoverable.    Until then no interest can be due.

We deem it unnecessary to decide any other question, and it follows from the foregoing views that the decree appealed from must be reversed, and the cause remanded to the chancery court, where such further proceedings may be had as may be in conformity to this opinion.    Ordered accordingly.

*Reversed.*

After the rendition of the foregoing opinion *Catchings & Catchings, Alexander & Alexander* and *T. M. Miller,* for appellees, submitted a suggestion of error, setting forth:

1. There is nothing in the record to warrant the assumption by the court that the lands were "probably expected to be sufficient for the retirement of the income bonds."    On the contrary, appellees insist that every indication furnished by the record shows conclusively that the lands were not probably expected to be sufficient for that purpose.

2. The court, in its opinion, erred in surmising that Martin and his associates, appellees, consented that the income bonds of 1885, in so far as the payment of interest was concerned, should be subordinated to any and all bonds which might at any time be issued, because they knew that the enterprise was full of hazard. The record does not justify such surmise.

3. The court, in its opinion, erred, in holding it to be a clear proposition that "the income bonds by their express terms are subordinate to all such bonds of the company as were issued from time to time and might be outstanding." There is no authority for interpolating these words into the bonds:" "were issued from time to time." The difference between these words and the real language of the bonds, to wit: "as shall be from time to time outstanding," is wide and deep.

4. The mortgage of September 18, 1884, securing these income bonds, did not convey the rents and income of the railway lines at all. As a result of the controversy raised by the amended bill of complaint, it was provided in the supplemental mortgage of 1885 that there should be a lien to secure the interest on the income bonds upon the rents and income, and for that purpose the rents and income were conveyed subject only to the lien of the first mortgage. The words, "subject to the lien of the first mortgage," ought to be given that significance; and the court does violence to the plain and simple English language when it refuses to do so.

5. The court, in its opinion, did not respond to appellees' contention that the bonds do not contain or purport to contain a grant of power to issue an unlimited amount of bonds.

6. The opinion of the court, unless modified, will require the subordination of the income bonds to all other bonds which have been or may be issued, regardless of the purposes for which issued.

7. In the phrase, "such other bonds of said company or its successors as shall be from time to time outstanding," the words, "such other bonds," clearly refer to the first mortgage bonds only.

CAMPBELL, Special Judge, delivered the opinion of the court in response to the suggestion of error.

Duly appreciating the sincerity and earnestness of counsel and the importance of this case, we have laboriously reconsidered it in all its features, aided by the criticism of our opinion in the suggestion of error and the former arguments of counsel. The mistake made by counsel, as we think, is in assuming that there was a limit to the mileage of railway the company might build or acquire, or the amount of bonds it might issue. There is no warrant for this in the mortgages or bonds, or in the precedent agreement of parties. By the contract of April 26, 1882, between Johnston and Martin, there was a stipulation as to what each was to get out of the enterprise of five hundred miles of railway, and by that of August 6, 1884, they provided for three companies named to consolidate and execute first mortgage bonds at the rate of $30,000 per mile, secured by a first mortgage on the railroad, etc., "whether already acquired or hereafter to be acquired," and "nonaccumulative income bonds" at the rate of $20,000 a mile, to be secured by a first mortgage on lands. Not a word is said about miles of railway which may be built or acquired, but it is stipulated that Johnston shall have first mortgage bonds to the amount of $24,000 a mile and an additional amount, not specified, rated at seventy-five cents on the dollar. "The balance of the first mortgage bonds shall remain the property of the consolidated company, and to be used for its benefit," is a clause of this agreement. "Capital stock of said consolidated company at and after the rate of $10,-000 per mile" was provided for by this agreement, all of which was to be delivered to Johnston, who was immediately to deliver to Martin and appointees income bonds to the amount of (at their face value) $1,066,666.17 and capital stock to amount of $533,333.34. This agreement was declared by it to be "in full compromise, settlement, satisfaction, and discharge of all claims and demands," except, etc., under two former agreements mentioned, and suits which each party had instituted

against the other were to be dismissed, injunctions were to be modified, etc.   This was a most important contract, and yet nowhere in it is there any suggestion of any limitation of miles of railroad which might be built or purchased or of bonds that might be issued or mortgages that could be issued to secure them.

The provision of this contract that the less than one-sixth part of the first mortgage bonds not to be Johnston's were to remain the property of the company, cited by counsel as supporting their view, in our view, has no such effect.   It simply declares that what does not go to Johnston shall be the company's. This contract led to the consolidation of four companies into the Louisville, New Orleans & Texas Company and execution by it of first mortgage bonds to amount of $20,550,000, payable after fifty years, with five per cent. interest per annum, payable semi-annually, and a mortgage on the railway of the Louisville, New Orleans & Texas Company, and its successors, constructed or to be constructed, until the length of such constructed railways shall amount in the aggregate to eight hundred miles, etc. The bonds issued were to be authenticated as provided for and delivered to the company at the rate of $30,000 for each mile of main line of railway constructed, and $20,000 for each mile of branch railway, etc., until eight hundred miles were reached, which was the extent provided for by the mortgage.   The first mortgage for securing the income bonds was on lands described therein only, and for bonds at the rate of $20,000 a mile of railroad ready for operation, with no limit as to the number of miles.   This has the same date as the first mortgage for $20,-550,000.   The second mortgage for securing income bonds (which was the result of the amended bill of Martin *et al.*), executed in 1885, conveyed the lands conveyed by the former mortgage for the income bonds, and their rents, issues, and profits, and also, subject to the lien of the first mortgage (for the $20,550,000 of bonds), all incomes of the railways which the company had or might acquire.   This supplemental income

bond mortgage is made a security for $10,000,000 of bonds, a fixed amount, which was not the case in the first mortgage for income bonds. Its provision that no more than $10,000,000 of bonds shall be issued thereunder, referring to the first mortgage for income bonds, "and none other shall participate in the benefits or security thereof," means no more than that the mortgage is a security for them alone, and that no others can share in it, just as the limitation in the mortgage for the $20,550,000 is as to the amount of bonds for which it is a security, and not a limitation of the right of the company to issue other bonds and secure them by other mortgages.

No other bonds can participate in that particular security, but the right to issue other bonds and secure them by other mortgages is in no manner affected. It is thus manifest that there is not, in precedent agreements or in the mortgages executed to secure bonds, any warrant for the claim made that any limit was placed on the right of the company to construct railways, or buy railways, and issue bonds, and secure them by mortgages subordinate to those issued, and all contentions based on the assumption that there was a limitation as to mileage or bonds are unsound. If there had been a limit as to mileage, it could not control the express language of the bonds. It is quite likely that in 1884 the contemplation was that eight hundred miles would be about the length of the railway, just as in 1882, five hundred miles were contemplated; but, as there was no limitation of mileage in 1882, there was none in 1884 or 1885. Since the view grew three hundred miles in two years, a greater expansion of this great and growing enterprise might well have been thought of. Certainly there was no limit prescribed by any instrument shown by the record of this case to the growth of this railroad and its branches. The mortgage for $20,550,000 of bonds and the mortgage of the same date for security of income bonds are independent instruments, each for the security of different bonds and conveying different property, and neither refers to the other, and the mortgage of 1885, supplemental to

that of 1884 for income bonds, adds security for the income bonds, and provides a scheme for their retirement from time to time by competitive bidding for money from sales of land; but it makes no reference to the mortgage for $20,550,000 of bonds, except to convey income of the railways subject to that mortgage. Counsel say this made the second mortgage for income bond subject only to the lien of the first mortgage, and that the words "subject to the lien of the first mortgage" ought to be given that significance, etc. That is precisely the significance we give these words of "plain and simple English." The mortgage of 1885 containing these words is "subject to the lien of the first mortgage," and subject to it only, a security for the income bonds, and for them only, and no other bonds can participate in that security.

The suggestion that we have held any other view is unwarranted, and we fail to see how such misconception could arise. But we fail to see what that has to do with the question as to the legal import of the terms of the income bonds as to interest on them. That the mortgage for their security is made subject to another mortgage throws no light on the terms of the bonds. It simply affects the security for them, and in no way aids the intrepretation of their terms. The bonds are one thing; the security for them, another thing. What the bonds mean is one thing, and what the mortgage to secure them binds is another thing. It secures the bonds according to their tenor and its legal effect. The question in this case is as to the meaning of the income bonds, as to interest on them, with reference to other bonds. There is no question about the security for them; but what bonds are entitled to have their interest paid before any shall accrue on income bonds? is the question. We fail to perceive any force in the arguments, drawn from the provisions of the different mortgages, as to the meaning of the income bonds in their stipulation for interest after "first paying [many items and] the interest payable from time to time upon such other bonds of said company or its successors as shall be from time

to time outstanding." The meaning of this provision is determinable alone by the terms of it. No light is furnished for its solution by anything in the mortgage.

What does the expression, "such other bonds of said company or its successors as shall be from time to time outstanding," mean? We are charged with interpolating, because of the use of the expression "issued from time to time," and are informed that there is "wide and deep" difference. We had supposed that a bond had to be issued before it could be outstanding, and that, if retired, it would not be outstanding; and we are of that opinion still. It is argued as if we found the right of the company to issue bonds in the terms of the bonds. This is unfounded. The power to issue bonds is not derived from the income bonds, and no such an idea is deducible from anything we have said; but as the question is, What claim to interest have the income bonds? it must be answered by their terms. They determine what may be claimed for them. Were a suit brought on the bonds, the question would not be as to their security, but as to their terms, unless the suit was to enforce the security for them, and in that case it would be enforced for them according to their terms. If their interest was absolute, it would be recovered; but, as it is contingent, in order to recover interest, it would be necessary to show that the contingency had occurred before its recovery could be had.

We have no guide to the meaning of the bonds except their language. All else is mere conjecture. Their language is plain, simple, and unambiguous. Interest on them is not payable until interest on "such other bonds of said company or its successors as shall be from time to time outstanding"—i. e., issued from time to time and not retired—shall be paid. Counsel say that "such other bonds" are the first mortgage bonds; but the income bonds do not say that. They say, "such other bonds"—i. e., all other, any other, bonds of the company or its successors. To limit that expression to first mortgage bonds is to deprive them of their full significance by interpolating.

If they had reference to the first mortgage bonds, or any other particular bonds, it may be justly supposed they would have been so worded. Besides, they were understood in 1885 to mean just what we say they mean, and were issued and accepted with that interpretation. It is not true that we based our view of them upon that urged by the amended bill set forth in our opinion; but we cited it to show the understanding of them before their issuance. No other view is maintainable; for no other is natural, lying on the surface, and giving full significance to bonds and mortgages. Whatever may have been thought or understood, the language employed is the only safe guide. All else is conjecture. We find what is to us a very reasonable explanation of the satisfaction of parties with the income bonds because of the greatly increased security for them by the supplemental mortgage of 1885; but our opinion is independent of that, and rests on the fact that no other view satisfies the language of the income bonds, and it must have its full meaning. The mortgage for the income bonds must have its full effect. It secures the $10,000,000 of income bonds, and no others; and none can share with them in this security, but it secures them according to their tenor.

The effort of learned counsel to maintain their contention that the other bonds referred to by the income bonds are the first mortgage bonds, and no other, is contradictory, and demonstrates its unsoundness. In one part of the suggestion of error they affirm that the reason for the provision "from time to time outstanding" was "intended to subordinate the income bonds to the first mortgage bonds to an amount not exceeding $20,-550,000, whether actually issued and outstanding or not." Again they say: "These bonds [the first mortgage bonds] were to be issued as needed, and not all at once. Hence it necessarily followed that all these bonds were not to be treated as being prior to the income bonds, when it came to be ascertained whether interest on the latter had been earned or not, but that only such of them should be so considered as might be from time

to time outstanding." Such are the difficulties in which learned counsel, deceived by their ingenuity, are involved in an effort to account for the language of the income bonds.

The suggestion of counsel that we overlooked the first mortgage for income bonds is a misapprehension. So far from overlooking it, it was an influential factor in our conclusion. It is entirely independent of the first mortgage, makes no reference to it, is for a different class of bond, and conveys different property. It is to be considered by itself, and has no bearing on the question involved, which is not as to the meaning of any of the mortgages, but what is the meaning of the income bonds as to interest? We have overlooked nothing. It is true that we did not respond specifically to the oral argument claiming that the Yazoo & Mississippi Valley Company is not the successor of the Loiusville, New Orleans & Texas Company, and we assumed that it is, because it is proceeded against as such in this suit, is sought to be held liable as such, and is described as such by the bill, and repeatedly so called in the brief of counsel for the appellees, and correctly, as we think. It certainly succeeded to all the belongings and obligations of the Louisville, New Orleans & Texas Company, and is its successor, and as such had the right to carry out and extend and complete the scheme of its predecessor as to the railways obtained from it. The Louisville, New Orleans & Texas Company ceased to be, and the Yazoo & Mississippi Valley Company took its place. There is now but one company, the Yazoo & Mississippi Valley Company. The company spoken of in our opinion, whose bonds, issued and outstanding, are entitled to precedence as to interest to that of the income bonds, is the Louisville, New Orleans & Texas Company, or its successor, the Yazoo & Mississippi Valley Company, and the bonds are such as were properly issued in the prosecution of the railroad scheme in which the Louisville, New Orleans & Texas Company was engaged. Our opinion admits of no such interpretation as to include bonds other than such as were or may be properly issued on account of the railways.

We did not and do not particularize the bonds entitled to precedence over the income bonds as to interest, leaving that for inquiry and decision in the future progress of the case. The Louisville, New Orleans & Texas Company had the right to acquire branches, feeders to the main line, and to issue bonds and give mortgages, and its right passed to the Yazoo & Mississippi Valley Company, its successor, which had the right it had as to its railways. The scheme of the Louisville, New Orleans & Texas Company was to possess the country east of the Mississippi river by a main line of railway from Memphis, Tenn., to New Orleans, La., with branches of indefinite length through an alluvial country largely undeveloped, liable to destructive overflows from the river, but a few years after the wreck and ruin of war and reconstruction, when the levee system was incomplete, and times were hard and money scarce, and the future seemed uncertain, and great public enterprizes full of hazard. Bonds were relied on to furnish the money for the great enterprise. The first mortgage bonds, secured by eight hundred miles of the railway, its income, and its equipments and appurtenances, bearing five per cent. interest per annum, payable semi-annually, having fifty years to run, were rated at seventy-five cents on the dollar in dealings between the promoters. Income bonds to amount of $10,000,000 were provided for, payable in fifty years, and with interest not to exceed six per cent. per annum, and that so contingent as to be very uncertain and hardly a factor in estimating value. In preparing these income bonds it is evident that the idea of future need for more money to be raised by more bonds was present, and that the interest on the income bonds was made contingent on various items, and among them the interest on "such other bonds of said company or its successors as shall be from time to time outstanding," thus providing a basis for credit for such bonds as should be found necessary in the future in the growth and maintenance of the enterprise. The security for the income bonds by the first mortgage for

them was only lands in several delta counties, supplemented by a new mortgage of these lands and their issues and profits, and subject to the first mortgage for $20,550,000 of bonds, the income of the entire railway, possessed or to be possessed, and a scheme for competitive bidding as often as $25,000 were appropriable for the purpose from sales of the lands mortgaged, whereby it was probably expected that a large part, if not all, of the bonds would be retired long before maturity. The value of the lands mortgaged was expected to increase rapidly with the development of the country by the railroad, and the expectation of rapid retirement of the income bonds was not unfounded. This great railroad company, formed of four separate roads by consolidation, was continually looking to and providing for the future, and in the various instruments executed by it used the terms "successors and assigns," as if contemplating such and providing for them, and it is inconceivable that the terms employed in the income bonds as to interest could have any other meaning attached than that which we give them.

What counsel call our "surmises" are our deductions from the record. Counsel indulge in various surmises deduced from from the record, which differ from ours because of the different perspective of court and counsel, as may be supposed. Eliminate all speculation and surmises as to why the particular language of the income bonds was employed, there it stands as written and unchanged, after it had been specifically objected to by the amended bill on the ground that it meant just what we say it means, and new and increased security for them as written and thus interpreted was accepted, and these bonds and capital stock to the sum of about a million dollars of bonds and half a million dollars of stock were issued and accepted without the change of a word in the bonds or any complaint of an erroneous interpretation of them, so far as we know, until this suit. With the history of these bonds contained in the record, it is incredible that their meaning as we declare it was not well understood by all dealing with them. Anyway they stand as the

sole exposition of their meaning. The fact that the Louisville, New Orleans & Texas Company may not have had express grant of authority to consolidate, gives no aid to the interpretation of the language of the income bonds. We find no warrant for limiting bonds which might be issued to bear interest payable before any on income bonds to those issued only for construction.

In the present state of the case we are not willing to grant the injunction asked for. All proper process may be obtained in the chancery court. Surely no one could have understood us to declare anything more, with reference to competitive bidding· by holders of income bonds, than that, since delay had occurred for reasons shown, the scheme provided by the mortgage of 1885 may now be carried out as to the whole fund derived from sales of the lands.

Our decision as heretofore made will stand, with this explanation of our views as set forth in our former opinion.

*Suggestion of error overruled.*